## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JEFF SMALL, Individually and On Behalf of All Others Similarly Situated, 461 Anjou Circle Sacramento, CA 95835 <br><br><br> Plaintiff, <br><br> v. <br><br> VANDA PHARMACEUTICALS INC., 2200 Pennsylvania Avenue, Suite 300E Washington, DC 20037 <br><br> And, <br><br> MIHAEL H. POLYMEROPOULOS, 2200 Pennsylvania Avenue, Suite 300E Washington, DC 20037 <br><br> And, <br><br> JAMES P. KELLY, 2200 Pennsylvania Avenue, Suite 300E Washington, DC 20037 <br><br> And, <br><br> PAOLO BAROLDI, 2200 Pennsylvania Avenue, Suite 300E Washington, DC 20037 <br><br> Defendants. | **Civil Case No.** <br><br> **CLASS ACTION** <br><br> **COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Jeff Small ("Plaintiff"), individually and on behalf of all other persons similarly

situated, by his undersigned attorneys, for his complaint against defendants, alleges the following

based upon personal knowledge as to himself and his own acts, and information and belief as to

all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Vanda Pharmaceuticals Inc. ("Vanda" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased Vanda securities between December 18, 2012 and June 18, 2013, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Vanda is a biopharmaceutical company focused on the development and commercialization of products for the treatment of central nervous system disorders. The Company's product portfolio includes tasimelteon, a compound for the treatment of circadian rhythm sleep disorders (CRSD), which is currently in clinical development for "Non-24," Fanapt, a compound for the treatment of schizophrenia, the oral formulation of which is currently being marketed and sold in the U.S. by Novartis Pharma AG (Novartis), and VLY-686, a small molecule neurokinin-1 receptor (NK-1R) antagonist.

3.     Non-24 is a serious, rare circadian rhythm disorder that affects a majority of totally blind individuals who lack light perception and cannot "entrain" (reset) their master body clock to the 24-hour day.  Currently there is no approved treatment for Non-24.

4.     Because totally blind individuals lack perception of the light and dark periods of the day, these individuals frequently lack entrainment, and are unable to maintain a "normal" circadian rhythm, whereby they sleep during the night and wake during the day. Therefore, entrainment, the matching of an individual's circadian rhythm to the daytime and nighttime periods of a day, is the primary goal of Non-24 therapy.

5.     On January 23, 2013, the Company represented to investors that, the "results [of Phase III data] clearly demonstrate that tasimelteon can entrain the circadian clock and is able to align melatonin and cortisol rhythms to the 24-hour social day."

6.     Undisclosed to investors, however, the Company altered the primary endpoints of its Phase III study as well as other aspects of the study's design in order to mislead investors regarding the efficacy of tasimelteon to entrain individuals affected by Non-24.  Specifically, the Company: i) changed the design of tasimelteon's primary Phase III study numerous times, including a complete replacement of the primary endpoint just one month before study results were announced; ii) used a replacement primary endpoint to assess tasimelteon's benefit which had never been used before in sleep-drug clinical trials, nor endorsed by the FDA; iii) enrolled patients in the Company's Phase III studies by stretching the clinical definition of non-24; and, iv) combined data from two Phase III studies of tasimelteon in order to demonstrate a benefit for Non-24 patients where the two Phase III studies failed individually.

7.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the results of the clinical

3

trial for tasimelteon.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was forced to unilaterally change the primary endpoint in the middle of the Phase III studies as it was already in possession of data suggesting that the original primary endpoint was not going to be met; (2) the Company eliminated nighttime total sleep as the primary endpoint in its studies as there was no discernible difference in efficacy and safety in nighttime total sleep between those patients deemed to have Non-24 and those patients with a normal circadian rhythm; (3) the replacement primary endpoint installed to assess tasimelteon's efficacy and safety was created *ex ante* by the Company and has never been used before in sleep-drug clinical trials, nor was it endorsed by the FDA; and (4) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

8.      On June 19, 2013, *The Street* published an article raising doubts about the quality and efficacy of Vanda's clinical trial procedure and test data.  Among other issues, the article noted multiple changes in the primary endpoint over the course of the trials, including a change just one month before study results were published to a new primary endpoint that has allegedly never been used before in sleep-drug clinical trials, nor was it endorsed by the FDA.  The article also states that Vanda was forced to cut patient enrollment in the clinical trials in half because an insufficient number of totally blind patients with Non-24 could not be identified, and that ultimately less than 5% of the patients enrolled in the trials suffered from Non-24 according to the "textbook definition" of the disease.

9.      On this news, Vanda shares declined $2.41 per share or more than 22%, to close at $8.51 per share on June 19, 2013.

#2004733v.1

10.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant damages.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections l0 (b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule l0b-5 promulgated thereunder by the SEC, 17 C.F.R § 240.10b-5.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). Vanda maintains its principal place of business in this District and many of the acts and practices complained of occurred in substantial part herein.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Vanda securities at artificially inflated prices during the Class Period and was damaged thereby.

16.     Defendant Vanda is a corporation organized under the laws of the state of Delaware, maintaining its principal place of business at 2200 Pennsylvania Avenue NW, Suite

#2004733v.1

300E, Washington, DC 20037.  Vanda's common stock trades on the NASDAQ Global Stock Market ("NASDAQ") under the ticker symbol "VNDA."

17.     Defendant Mihael H. Polymeropoulos ("Polymeropoulos"), at all relevant times, has been the Company's President and Chief Executive Officer.  Defendant Polymeropoulos was a Co-Founder of the Company.

18.     Defendant James P. Kelly ("Kelly"), at all relevant times, has been the Company's Senior Vice President and Chief Financial Officer.

19.     Defendant Paolo Baroldi ("Baroldi") has been the Company's Senior Vice President and Chief Medical Officer since April 2013.

20.     The defendants referenced above in ¶¶17 - 19 are referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

21.     Vanda is a biopharmaceutical company focused on the development and commercialization of products for the treatment of central nervous system disorders. The Company's product portfolio includes tasimelteon, a compound for the treatment of circadian rhythm sleep disorders (CRSD), which is currently in clinical development for Non-24.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS MADE DURING THE CLASS PERIOD

22.     On December 18, 2012, the Company issued a press release announcing positive results for tasimelteon from the SET (Safety and Efficacy of Tasimelteon) Phase III study, evaluating tasimelteon.   The Phase III study concluded that "Tasimelteon succeeded in the

6

primary endpoint of Entrainment of the melatonin (aMT6s) rhythm as compared to placebo."

The press release further stated the following in relevant part:

> Additionally, tasimelteon demonstrated significant improvements across a number of sleep and wake parameters including measures of total sleep time, nap duration, and timing of sleep.  Tasimelteon also showed significant improvements over placebo in the Non-24 Clinical Response Scale (N24CRS) as well as in the Clinical Global Impression of Change (CGI-C), an overall global functioning scale.  These results provide robust evidence of a direct and clinically meaningful benefit to patients with Non-24.
>
> ***
>
> "Today's results confirm tasimelteon as a strong circadian regulator capable of entraining the master body clock in patients with Non-24.  We are particularly impressed and excited by the magnitude and robustness of the direct clinical benefits to patients," said Mihael H. Polymeropoulos, M.D., President and CEO of Vanda.  "We believe that tasimelteon can be an effective and clinically meaningful treatment for patients suffering with this debilitating disorder."
>
> ***

### Primary Endpoints

The SET study was an 84 patient randomized, double-masked, placebo-controlled study in patients with Non-24.  The primary endpoints for this study were Entrainment of the melatonin (aMT6s) rhythm to the 24-hour clock and Clinical Response as measured by Entrainment plus a score of greater than or equal to 3 on N24CRS.

### Primary Endpoint Results

Table 1

| | Tasimelteon (%) | Placebo (%) | p-value |
|---|---|---|---|
| Entrainment (aMT6s) | 20.0 | 2.6 | 0.0171 |
| Clinical Response (Entrainment[1] + N24CRS >=3) | 23.7 | 0.0 | 0.0028 |
| Clinical Response[2] (Entrainment[1] + N24CRS >=2) | 28.9 | 0.0 | 0.0006 |
| N24CRS >=3[2] | 28.9 | 2.9 | 0.0031 |
| N24CRS >=2[2] | 57.9 | 20.6 | 0.0014 |

1) Entrainment status from the randomized portion of the SET study and/or the screening portion of the RESET study
2) Sensitivity Analysis

7

**Secondary Endpoints**

The SET study also assessed a number of secondary endpoints including Entrainment of cortisol rhythm and a broad range of clinical sleep and wake parameters. These parameters included improvement in the total nighttime sleep in the worst 25% of nights (LQ-nTST), decrease in the total daytime sleep duration in the worst 25% of days (UQ-dTSD) and midpoint of sleep timing (MoST) which is derived from a combination of the sleep reported for both nighttime and daytime. CGI-C is a seven-point rating scale of global functioning with lower scores indicating larger improvements.

**Secondary Endpoint Results**

Table 2

|  | Tasimelteon | Placebo | p-value |
|---|---|---|---|
| Entrainment (cortisol) (%) | 17.5 | 2.6 | 0.0313 |
| N24CRS (LS mean) | 1.77 | 0.67 | 0.0004 |
| CGI-C[1] (LS mean) | 2.6 | 3.4 | 0.0093 |
| LQ-nTST and UQ-dTSD >=90 min[2] (%) | 23.8 | 4.5 | 0.0767 |
| LQ-nTST and UQ-dTSD >= 45 min[3] (%) | 31.6 | 8.8 | 0.0177 |
| LQ-nTST (LS mean minutes) | 57.0 | 16.8 | 0.0055 |
| UQ-dTSD[1] (LS mean minutes) | -46.2 | -18.0 | 0.0050 |
| MoST (LS mean minutes) | 34.8 | 14.4 | 0.0123 |

1) For CGI-C and UQ-dTSD smaller numbers indicate improvement.
2) For this endpoint, only subjects with significant sleep and nap problems at baseline were included.
3) Sensitivity Analysis

The results of the SET study represent the initial data from the tasimelteon Non-24 Phase III development program and demonstrate the multiple benefits of this novel therapy in treating patients suffering from this rare circadian rhythm disorder. In the SET study, tasimelteon was demonstrated to be safe and well tolerated. Vanda expects to report top-line results from the second Phase III study (RESET) for tasimelteon in Non-24 in the first quarter of 2013. Vanda plans to submit a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) in mid-2013.

"We would like to thank our patients, their advocates, investigators, advisors and colleagues for making this study possible," said Mihael H. Polymeropoulos, M.D., President and CEO of Vanda. "We look forward to the successful completion of the Non-24 clinical program."

**Non-24 Scale of Clinical Response (N24CRS)**

| Assessment | Threshold of response |
|---|---|
| LQ-nTST | >=45 minutes increase in average nighttime sleep duration |
| UQ-dTSD | >=45 minutes decrease in average daytime sleep duration |
| MoST | >=30 minutes increase and a standard deviation <=2 hours during double-masked phase |
| CGI-C | <=2.0 from the average of Day 112 and Day 183 compared to baseline |

23.     That same day, the Company held a conference call with analysts to discuss the

SET Phase III Trial results. Defendant Polymeropoulos stated the following in relevant part:

> The SET study was an 84 patient randomized, double-masked, placebo-controlled study in patients with Non-24. Tasimelteon succeeded in the primary endpoint of entrainment of the melatonin rhythm as compared to placebo.
>
> ***
>
> As we announced in our press release, the primary endpoint for this study were first entrainment of the melatonin, alpha MT6s rhythm to the 24-hour clock, and then it was the clinical response as measured by entrainment plus a score of greater than or equal to 3 on the Non-24 Clinical Response Scale.
>
> The Non-24 Clinical Response Scale is composed of four clinical measurement items. The first one is a lower quartile of nighttime total sleep time and the threshold of response was defined as greater or equal to 45 minutes increase in average nighttime sleep duration.
>
> The second item on the Non-24 CRS scale is the other quartile of daytime sleep time. And the threshold of response was defined again as grater/equal to 45 minutes decrease in average daytime sleep duration.
>
> The third item on this scale is the midpoint of sleep, or MoST, and the threshold of response was defined as greater/equal to 30 minutes increase and a standard deviation of less than 2 hours during the double-masked phase. This item refers to the timing of sleep.
>
> And finally, the fourth item is a global functioning scale, CGI-C, and the threshold of response was less/equal to 2 from the average of days 112 and day 183 as compared to baseline. To remind everyone, CGI-C is a seven-item scale and a lower number suggests improvement.

9

The results of the primary endpoints were as follows. On the primary endpoint of entrainment of the melatonin rhythm, tasimelteon performed significantly better than placebo and that difference was significant at 0.01 p-value.

On the next primary endpoint of clinical response – and that was a patient who is called responder if the patient was both entrained and had a significant improvement in three out of the four items of the Non-24 CRS scale – and again, the comparison to placebo was significant at a p-value of 0.002.

*** 

And the second item that comes out of this data is that this entrainment was associated with highly significant clinical responses as defined in this clinical response primary endpoint. We went on and analyzed an array of secondary endpoints that have been discussed in the press release. First of all, we looked at entrainment of the cortisol rhythm. That is another hormone that has a circadian pattern, and that circadian pattern is again evident in most blind individuals. We again observed that tasimelteon was able to entrain the cortisol circadian rhythm and do so significantly better than placebo at a p-value of 0.03.

24.     On January 23, 2013, the Company issued a press release announcing positive results for the RESET (Randomized-withdrawal study of the Efficacy and Safety of Tasimelteon) Phase III study of tasimelteon for the treatment of Non-24.   The press release stated the following in relevant part:

The RESET study (Randomized-withdrawal study of the Efficacy and Safety of Tasimelteon to treat Non-24-Hour Disorder), demonstrated the maintenance effect of 20mg of tasimelteon to entrain melatonin and cortisol circadian rhythms in individuals with Non-24.  Tasimelteon treated patients maintained their clinical benefits while placebo treated patients showed significant deterioration in measures of nighttime sleep, daytime naps, and timing of sleep.  Non-24 is a serious, rare circadian rhythm disorder that affects a majority of totally blind individuals who lack light perception and cannot entrain (reset) their master body clock to the 24-hour day.  Currently there is no approved treatment for Non-24.

"These results clearly demonstrate that tasimelteon can entrain the circadian clock and continued treatment is necessary to maintain entrainment," said Steven W. Lockley, Ph.D., Division of Sleep Medicine, Brigham and Women's Hospital, a teaching affiliate of Harvard Medical

School.  "The study also shows that entrainment is associated with meaningful clinical benefits and that maintaining entrainment of the master body clock is critical to treating the problems caused by Non-24."

"We are excited by these results as they move us one step closer towards providing a treatment for blind individuals with Non-24," said Mihael H. Polymeropoulos, M.D., President and CEO of Vanda.  "These results also highlight the importance of chronic therapy in treating Non-24.  We are confident that if approved, tasimelteon may significantly improve the quality of life for individuals with Non-24."

### RESET Study Results Summary

### Primary Endpoint

The RESET study was a 20 patient randomized withdrawal study designed to demonstrate the maintenance effect of 20mg of tasimelteon in the treatment of blind individuals with Non-24. Patients were treated with tasimelteon for three months during an open-label run-in phase.  Patients who responded to tasimelteon treatment during the run-in phase, as measured by entrainment of the melatonin rhythm (aMT6s) to the 24-hour day, were then randomized to receive either placebo or continue receiving tasimelteon 20mg for 2 months.  The primary endpoint of the study was the maintenance of effect as measured by entrainment of the melatonin (aMT6s) rhythm.

### Primary Endpoint Results

|  | Tasimelteon | Placebo | p-value |
|---|---|---|---|
| Maintenance of entrainment (aMT6s) (%) | 90.0 | 20.0 | 0.0026 |

### Secondary Endpoints

The RESET study also assessed a number of secondary endpoints including maintenance of entrainment of the cortisol rhythm and a range of sleep and wake parameters including LQ-nTST (total nighttime sleep in the worst 25% of nights), UQ-dTSD (total daytime sleep duration in the worst 25% of days) and MoST (midpoint of sleep timing from both nighttime and daytime sleep).

### Secondary Endpoint Results

|  | Tasimelteon | Placebo | Difference | p-value |
|---|---|---|---|---|
| Maintenance of | 80.0 | 20.0 | 60.0 | 0.0118 |

11

| entrainment (cortisol) (%) | | | |
|---|---|---|---|
| LQ-nTST (LS mean minutes)[1] | -6.6 | -73.8 | 67.2 | 0.0233 |
| UQ-dTSD (LS mean minutes)[2] | -9.6 | 49.8 | -59.4 | 0.0266 |
| MoST (LS mean minutes)[1] | 19.8 | -16.2 | 36.0 | 0.0108 |

1) Higher number indicates improvement
2) Lower number indicates improvement

From the run-in phase of the study, the rate of entrainment among tasimelteon treated patients ranged from 50% to 85% based on individual patient characteristics. In a time to relapse analysis (45 min decrement of weekly average nighttime sleep), placebo treated patients relapsed in higher numbers and at an earlier time than tasimelteon treated patients (P = 0.0907).

The RESET study demonstrates the efficacy of chronic treatment with tasimelteon in Non-24 and further supports the results of the SET study, which established the ability of tasimelteon to entrain the master body clock and significantly improve the clinical symptoms of Non-24. Vanda plans to submit a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) in mid-2013. Vanda will meet with the FDA in Q1 of 2013 for a pre-NDA meeting on tasimelteon in the treatment of patients with Non-24.

25.     On February 12, 2013, the Company issued a press release announcing financial results for its fourth quarter and year ended December 31, 2012. The press release stated in relevant part the following:

In December 2012 and January 2013, Vanda announced positive results for two Phase III studies for tasimelteon in the treatment of Non-24. The SET Phase III study demonstrated that tasimelteon was able to entrain the master body clock as measured by melatonin and cortisol circadian rhythms. Tasimelteon was also shown to significantly improve clinical symptoms across a number of sleep and wake measures. These results provided robust evidence of direct and clinically meaningful benefits to patients with Non-24. The RESET Phase III study demonstrated the maintenance effect of 20mg of tasimelteon to entrain melatonin and cortisol circadian rhythms in individuals with Non-24. Patients treated with tasimelteon maintained their clinical benefits while patients receiving placebo showed significant deterioration in measures of nighttime sleep, daytime naps and timing of sleep.

12

26. On January 23, 2013, the Company held a conference call with analysts to discuss the

RESET Phase III results.  Defendant Polymeropoulos stated the following in relevant part:

> The RESET study was a 20-patient, randomized withdrawal study designed to demonstrate the maintenance effect of 20 milligrams of tasimelteon in the treatment of blind individuals with Non-24.  Patients were treated with tasimelteon for three months during an open-label run-in phase.  Patients who responded to tasimelteon treatment during the run-in phase, as measured by entrainment of the melatonin rhythm to the 24-hour day, were then randomized to receive either placebo or continue receiving tasimelteon 20 milligrams for an additional two months.
>
> We believe the results from this study provide robust evidence of a direct and clinically meaningful benefit to patients. The primary endpoint of this study was the maintenance of effect as measured by entrainment of the melatonin rhythm. The results of this study demonstrated that maintenance of entrainment was seen in 90% of the tasimelteon-treated patients as compared to 20% of placebo-treated patients. The difference was highly significant, with a p-value of 0.0026.
>
> We also studied a number of secondary endpoints, including maintenance of entrainment of the cortisol rhythm and a range of sleep and wake parameters, including the lower quartile of nighttime sleep, the upper quartile of daytime sleep, and the midpoint of sleep timing for both nighttime and daytime sleep.
>
> The secondary endpoint results showed, first, that maintenance of entrainment as measured by the cortisol rhythm was again seen in 80% of the tasimelteon-treated patients as compared to 20% of the placebo-treated patients, a significant difference at p-value 0.0118.
>
> The three additional clinical measures -- first, the lower quartile of nighttime sleep, tasimelteon-treated patients [lost] less than six minutes as compared to baseline, where placebo-treated patients lost on average 73.8 minutes per night, a very significant difference and clinically meaningful. The p-value of that comparison is 0.023.
>
> The same picture emerged in the daytime sleep measures, where tasimelteon-treated patients continued to see improvement of about nine minutes decrease in daytime sleep from baseline, where placebo-treated patients began sleeping, on average, another 49.8 minutes per day during the day, highly clinically meaningful and statistically significant at p-value 0.026.

13

And finally, the midpoint of sleep timing, which is indicative on when do the patients sleep, demonstrated again a significant difference between tasimelteon and placebo of 36 minutes improvement for tasimelteon with a p-value of 0.0108.

In the recent study, tasimelteon was also demonstrated to be safe and well-tolerated.  A couple of additional observations. From the run-in phase, the rate of entrainment, that is how many patients do entrain on tasimelteon, was calculated to be approximately between 50% and 85% of the patients treated with tasimelteon, based on individual patient characteristics. Certainly a very impressive number that up to 85% of the patients can be seen to entrain with 20 milligrams of tasimelteon at nighttime.

In a time-to-relapse, where relapse was defined as a 45-minute decrement of daily average nighttime sleep over a period of a week, placebo-treated patients relapsed in higher numbers and at an earlier time than tasimelteon-treated patients. The comparison had a (inaudible) total significance with a p-value of 0.09.

The results of both the SET and RESET studies represent the complete efficacy data for the tasimelteon Non-24 development program and demonstrate multiple benefits of this novel therapy in treating patients with this rare, debilitating circadian disorder.

27.   On February 26, 2013, the Company filed an annual report with the SEC on a Form 10-K for the year ended December 31, 2012, which was signed, among others, by Defendants Polymeropoulos and Kelly.   In addition, the Form 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Polymeropoulos and Kelly, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

28.   The Form 10-K represented the following concerning tasimelteon:

Tasimelteon is a circadian regulator in development for the treatment of Non-24. Tasimelteon is a melatonin agonist of the human MT1 and MT2 receptors, with greater specificity for MT2. Tasimelteon's ability to reset the master body clock in the suprachiasmatic nucleus (SCN), located in the hypothalamus, results in the entrainment of the body's melatonin and cortisol rhythms to align to the 24-hour day-night cycle. In December 2012 and January 2013, we announced positive results for two Phase III studies for tasimelteon in the treatment of Non-24. The SET Phase III

study demonstrated that tasimelteon was able to entrain the master body clock as measured by melatonin and cortisol circadian rhythms. Tasimelteon was also shown to significantly improve clinical symptoms across a number of sleep and wake measures. These results provided robust evidence of direct and clinically meaningful benefits to patients with Non-24. The RESET Phase III study demonstrated the maintenance effect of 20 milligrams (mg) of tasimelteon to entrain melatonin and cortisol circadian rhythms in individuals with Non-24. Patients treated with tasimelteon maintained their clinical benefits while patients receiving placebo showed significant deterioration in measures of nighttime sleep, daytime naps and timing of sleep. The tasimelteon Non-24 program continues towards its goal of a projected mid-2013 NDA filing with the FDA. We will meet with the FDA in the first quarter of 2013 for a pre-NDA meeting on tasimelteon in the treatment of patients with Non-24.

***

### Potential advantages of tasimelteon

We believe that tasimelteon may represent a breakthrough treatment option for patients with CRSDs based on the compound's demonstrated ability to reset the master body clock and align it with the 24-hour day. We believe that tasimelteon is unlikely to be scheduled as a controlled substance by the DEA because Rozerem, which has a similar mechanism of action to tasimelteon, was shown not to have potential for abuse and was not classified as a Schedule IV controlled substance by the DEA. Tasimelteon also appears to be safe and well-tolerated, with no significant side effects or effects on next-day performance.

### Overview of Phase III clinical trials for Non-24

In December 2012, we reported positive top-line results in a randomized, double-blind, multi-center, placebo-controlled Phase III trial (SET study) that enrolled 84 patients. Tasimelteon succeeded in the primary endpoint of entrainment of the melatonin (aMT6s) rhythm as compared to placebo. Additionally, tasimelteon demonstrated significant improvements across a number of sleep and wake parameters including measures of total sleep time, nap duration, and timing of sleep. Tasimelteon also showed significant improvements over placebo in the Non-24 Clinical Response Scale (N24CRS) as well as in the Clinical Global Impression of Change (CGI-C), an overall global functioning scale. These results provide robust evidence of a direct and clinically meaningful benefit to patients with Non-24. In the SET study, tasimelteon was demonstrated to be safe and well tolerated. The trial examined 20mg of tasimelteon dosed 30 minutes before bedtime versus placebo. The SET study was an 84 patient randomized, double-masked, placebo-controlled study in patients with Non-24. The primary endpoints for this study were entrainment of the

15

melatonin (aMT6s) rhythm to the 24-hour clock and Clinical Response as measured by entrainment plus a score of greater than or equal to 3 on N24CRS.

In January 2013, we announced positive results for the second Phase III study of tasimelteon for the treatment of Non-24. The RESET study demonstrated the maintenance effect of 20mg of tasimelteon to entrain melatonin and cortisol circadian rhythms in individuals with Non-24. Patients treated with tasimelteon maintained their clinical benefits while patients receiving placebo showed significant deterioration in measures of nighttime sleep, daytime naps, and timing of sleep. The RESET study was a 20 patient randomized withdrawal study designed to demonstrate the maintenance effect of 20mg of tasimelteon in the treatment of blind individuals with Non-24. Patients were treated with tasimelteon for three months during an open-label run-in phase. Patients who responded to tasimelteon treatment during the run-in phase, as measured by entrainment of the melatonin rhythm (aMT6s) to the 24-hour day, were then randomized to receive either placebo or continue receiving tasimelteon 20mg for 2 months. The primary endpoint of the study was the maintenance of effect as measured by entrainment of the melatonin (aMT6s) rhythm.

29. On March 25, 2013, the Company issued a press release announcing that the Company held a pre-NDA meeting with the Division of Neurology Products of the FDA to discuss the regulatory path for filing a NDA for tasimelteon.  The press release stated the following in relevant part:

At the pre-NDA meeting, the FDA confirmed that the efficacy and safety data proposed by Vanda to be submitted in the tasimelteon NDA for Non-24 is adequate to support filing.  The NDA supporting package that includes data from clinical pharmacology, pre-clinical pharmacology program, chemistry and manufacturing was also deemed adequate to support filing.

30.    On May 10, 2013, the Company filed a quarterly report with the SEC on a Form 10-Q for the quarter ended March 31, 2013, which was signed by Defendants Polymeropoulos and Kelly.  In addition, the Form 10-Q contained certifications pursuant to SOX signed by Defendants Polymeropoulos and Kelly, stating that the financial information contained in the

16

Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.     The Form 10-Q represented the following concerning tasimelteon:

> In December 2012 and January 2013, we announced positive results for two Phase III studies for tasimelteon in the treatment of Non-24. The SET Phase III study demonstrated that tasimelteon was able to entrain the master body clock as measured by melatonin and cortisol circadian rhythms. Tasimelteon was also shown to significantly improve clinical symptoms across a number of sleep and wake measures. These results provided robust evidence of direct and clinically meaningful benefits to patients with Non-24. The RESET Phase III study demonstrated the maintenance effect of 20 milligrams (mg) of tasimelteon to entrain melatonin and cortisol circadian rhythms in individuals with Non-24. Patients treated with tasimelteon maintained their clinical benefits while patients receiving placebo showed significant deterioration in measures of nighttime sleep, daytime naps and timing of sleep. We held a pre-NDA meeting with the U.S. Food and Drug Administration's (FDA) Division of Neurology Products in the first quarter of 2013 to discuss the regulatory path for filing a New Drug Application (NDA) for tasimelteon for the treatment of patients with Non-24. At the pre-NDA meeting, the FDA confirmed that the efficacy and safety data that we proposed to submit in the tasimelteon NDA for the treatment of Non-24 is adequate to support filing. The NDA supporting package that includes data from clinical pharmacology, pre-clinical pharmacology program, chemistry and manufacturing was also deemed adequate to support filing. Based on the feedback received at the pre-NDA meeting, we are targeting a tasimelteon NDA submission for Non-24 in mid-2013.

32.     On May 31, 2013, the Company issued a press release announcing the submission to the FDA its New Drug Application ("NDA") for tasimelteon.  The press release further stated the following:

> "The NDA submission of tasimelteon for Non-24 represents a significant accomplishment for Vanda in our efforts to address unmet medical needs," said Mihael H. Polymeropoulos M.D., Vanda's President and Chief Executive Officer.  "We are excited to have submitted an application for the first circadian regulator, representing a new class of therapeutics.  The data demonstrates that tasimelteon is able to reset the master body clock and synchronize the melatonin and cortisol circadian rhythms, resulting in significant clinical benefits to patients".

Vanda previously announced that the FDA confirmed, at a recent pre-NDA meeting, that the efficacy, safety and supporting data package proposed to be included in the NDA would be adequate to support filing of the NDA for review by the Agency.  The tasimelteon Non-24 NDA includes data from the largest clinical program conducted to date for any investigational therapy for the treatment of Non-24.

33.     On June 5, 2013, the Company issued a press release announcing additional entrainment and patient-level clinical data at SLEEP 2013 from its SET and RESET Phase III studies of tasimelteon.  The press release stated the following in relevant part:

In the SET study, tasimelteon achieved the primary endpoints of entrainment (synchronizing) of the melatonin (aMT6s) rhythm as compared to placebo and clinical response as measured by entrainment plus a score of greater than or equal to 3 on the Non-24 Clinical Response Scale (N24CRS).  Tasimelteon also demonstrated significant improvement versus placebo across a number of sleep and wake parameters including measures of total sleep time, nap duration, and timing of sleep, as well as in the Clinical Global Impression of Change (CGI-C), an overall global functioning scale.  In treated patients, daytime naps decreased by 46 minutes per day in the worst 25% of days in a cycle and nighttime sleep increased by 57 minutes per day during the worst 25% of nights in a cycle.

The RESET study demonstrated that continued treatment with 20mg of tasimelteon was required to maintain entrainment of melatonin and cortisol circadian rhythms in individuals with Non-24. Patients treated with tasimelteon maintained their clinical benefits while patients who received placebo showed significant deterioration in measures of nighttime sleep, daytime naps and timing of sleep.  Furthermore, discontinuation of tasimelteon resulted in a rapid relapse of circadian entrainment and a return to misaligned circadian rhythms, reinforcing the importance of chronic therapy.

Study investigator, Steven W. Lockley, Ph.D., Associate Professor of Medicine, Division of Sleep Medicine, Brigham and Women's Hospital, Harvard Medical School, commented, "the results clearly demonstrate that tasimelteon can entrain the circadian clock, and that continued treatment is necessary to maintain entrainment."

34.     On June 17, 2013, the Company issued a press release announcing additional data at the ENDO 2013, the Endocrine Society's 95th Annual Meeting "demonstrating that

tasimelteon can entrain (synchronize) both melatonin and cortisol rhythms." The press release further stated the following in relevant part:

> This effect further confirms tasimelteon's potential to reset the master body clock and address the circadian desynchrony which is inherent in Non-24-Hour Disorder (Non-24). The SET (Safety and Efficacy of Tasimelteon) and RESET (Randomized-withdrawal study of the Efficacy and Safety of Tasimelteon to treat Non-24-Hour Disorder) Phase III studies were designed to assess the safety, efficacy and maintenance effect of tasimelteon for Non-24. Currently there is no approved FDA treatment for Non-24.

> The simultaneous entrainment of both melatonin and cortisol reinforces tasimelteon as a circadian regulator, resetting the master body clock in the suprachiasmatic (SCN) nucleus. Cortisol is a key regulatory hormone which exhibits a strong circadian rhythm, usually rising in the early morning and falling in the evening. The circadian regulation of cortisol is necessary for the human body to be prepared for a wide range of daily activities and physiologic functions, including blood pressure variation, utilization of fatty acids, circulating lymphocytes and immunity.

> "In addition to entrainment of melatonin, entrainment of cortisol establishes tasimelteon as a circadian regulator, addressing an unmet need for people living with Non-24, a debilitating circadian rhythm disorder," said Mihael H. Polymeropoulos M.D., Vanda's President and Chief Executive Officer.

> In the SET study, tasimelteon achieved the primary endpoints of entrainment (synchronizing) of the melatonin (aMT6s) rhythm as compared to placebo and clinical response as measured by entrainment plus a score of greater than or equal to 3 on the Non-24 Clinical Response Scale (N24CRS). Tasimelteon also demonstrated significant improvement versus placebo across a number of sleep and wake parameters including measures of total sleep time, nap duration, and timing of sleep, as well as in the Clinical Global Impression of Change (CGI-C), an overall global functioning scale. In treated patients, daytime naps decreased by 46 minutes per day in the worst 25% of days in a cycle and nighttime sleep increased by 57 minutes per day during the worst 25% of nights in a cycle.

> The RESET study demonstrated that continued treatment with 20mg of tasimelteon was required to maintain entrainment of melatonin and cortisol circadian rhythms in individuals with Non-24. Patients treated with tasimelteon maintained their clinical benefits while patients who received placebo showed significant deterioration in measures of nighttime sleep, daytime naps and timing of sleep. Furthermore,

19

discontinuation of tasimelteon resulted in a rapid relapse to misaligned circadian rhythms, reinforcing the importance of chronic therapy.

"These results clearly demonstrate that tasimelteon can entrain the circadian clock and is able to align melatonin and cortisol rhythms to the 24-hour social day," said Steven W. Lockley, Ph.D., Associate Professor of Medicine, Division of Sleep Medicine, Brigham and Women's Hospital, Harvard Medical School.

35.     The statements referenced in ¶¶ 22-34 above were materially false and/or misleading because they misrepresented and failed to disclose that (1) the Company was forced to unilaterally change the primary endpoint in the middle of the Phase III studies as it was already in possession of data suggesting that the original primary endpoint was not going to be met; (2) the Company eliminated nighttime total sleep as the primary endpoint in its studies as there was no discernible difference in efficacy and safety in nighttime total sleep between those patients deemed to have Non-24 and patients with a normal circadian rhythm; (3) the replacement primary endpoint installed to assess tasimelteon's efficacy and safety was created by the Company and has never been used before in sleep-drug clinical trials, nor has it been endorsed by the FDA; and (4) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

## THE TRUTH IS REVEALED

36.     On June 19, 2013, *The Street* published an article entitled, "Vanda's Sleep Order Is a Nightmare."  The article disclosed numerous flaws in the conduct of the clinical trials and the analysis of its results, stating, in relevant part:

Vanda Pharmaceuticals tells a pretty compelling story about the development of tasimelteon for the treatment of a rare sleep-pattern disorder that affects blind people. Dig into the company's clinical work on tasimelteon, however, and you'll find a disturbingly large number of irregularities and red flags which should ring alarm bells for any investor betting on the drug's approval.

20

***

Based on results from two phase III studies, Vanda believes tasimelteon is the first drug shown to "entrain" non-24 patients back into a normal circadian rhythm. Tasimelteon also improves sleep performance, the company says.

In May, Vanda submitted a U.S. approval application for tasimelteon to treat non-24 disorder. The U.S. Food and Drug Administration has not yet accepted the tasimelteon submission for review or set an official approval decision date.

This is where Vanda's tasimelteon story runs off the rails.

• The design of Vanda's primary phase III study changed numerous times, including a complete replacement of the primary endpoint just one month before study results were announced.
•  The replacement primary endpoint installed to assess tasimelteon's benefit was created by Vanda and has never been used before in sleep-drug clinical trials, nor was it endorsed by the FDA.
•  Vanda was forced to cut in half the patient enrollment into the tasimelteon clinical trials because totally blind patients with non-24 could not be identified. Even then, Vanda was only able to enroll patients by stretching the clinical definition of non-24.
• Tasimelteon was only able to demonstrate a benefit for non-24 patients by combining data from two phase III studies. Despite Vanda's claims to the contrary, the phase III studies may have actually failed on their own.

Let's dig into these Vanda red flags in more detail. But first, I'll note Vanda executives chose not to respond to questions about tasimelteon's clinical development. The company arranged an interview with Stephen Lockley, a Harvard professor and sleep expert who oversaw the tasimelteon clinical trials. On Tuesday, hours before the interview with Lockley was to take place, a Vanda spokeswoman emailed to say Lockley was called away by an emergency and would be unavailable. Moreover, Lockley was unable to reschedule because he was traveling through the middle of July.

If you're intending to seek FDA approval for a drug to treat patients who can't sleep when they should (at night) and sleep too much when they shouldn't (during the day), designing a clinical trial that measures improvement in total sleep time at night makes a lot of sense.

Vanda's original study design did just that. Go back to July 2010 when Vanda first started enrolling patients in the phase III "SET" study: Patients diagnosed with non-24 were to be randomized to treatment with either tasimelteon or a placebo. The study's primary endpoint was a comparison

of average "nighttime total sleep time" between the two arms. Secondarily, the study was designed to assess tasimelteon's ability to improve other measures of sleep performance, including reductions in day time sleep and overall patient quality of life.

In 2012, Vanda's investor presentation began to include a change in the tasimelteon study. Entrainment -- defined as the "the ability to reset the body clock and maintain a 24-hour clock" -- was listed as a co-primary endpoint of the phase III "SET" study along with nighttime total sleep. The change in the tasimelteon study design to include co-primary endpoints was "under discussion with the US FDA," according to Vanda's investor slides, despite the study being underway for two years.

In June 2012, entrainment was listed as the sole primary endpoint of the tasimelteon "SET" study. Nighttime total sleep was deleted entirely.

In November of the same year, the tasimelteon study design was changed again to analyze co-primary endpoints: 1) entrainment; and 2) a measure of response defined as a "significant improvement... in key clinical measures."

This final change was put in place one month before the "SET" study results were analyzed and announced by Vanda in December 2012.

The timing of the changes to the tasimelteon study in the middle of 2012 were pushed through at the same time Vanda already had data in hand from the study suggesting the original primary endpoint -- improvement in night time total sleep -- was likely to fail.

In mid-2012, Vanda conducted an analysis of 161 blind people with self-reported sleep problems who participated in screening for the phase III "SET" study. Of these patients interested in enrolling into the tasimelteon study, 107 were found to have non-24 and would therefore be eligible, while 54 had "normal" circadian rhythms and therefore could not participate. Sleep performance data, including night time total sleep, was collected for all the patients.

The goal of this analysis, according to Vanda's own poster, was to confirm that night time total sleep -- the endpoint already chosen for the ongoing phase III study -- was an appropriate measure for assessing the clinical benefit of a drug to treat non-24.

And here is how Vanda presented the results of this endpoint analysis:

*Nightime total sleep time (nTST) measures the total amount of time an individual is asleep over the entire sleep opportunity. Individuals with*

*N24HSWD [non-24] get, on average, 53 minutes less nighttime sleep than the individuals without this disorder (entrained)* **during the worst quartile of all of their sleep**. *This difference was statistically significant." [Bolded emphasis mine.]*

Did you catch the bait and switch? Vanda doesn't present data on nighttime total sleep, even though this information was collected for all patients. Instead, Vanda only discloses sleep time for 25 percent of nights when sleep times were lowest (the worst quartile.)

This suggests there was no discernible difference in nighttime total sleep between those blind patients deemed to have non-24 and blind patients with a normal circadian rhythm. If there was a significant difference, why not disclose? Vanda doesn't, even though nighttime total sleep is the primary endpoint of the phase III study.

Vanda presented a poster on this endpoint analysis in June 2012. That same month, Vanda eliminated nighttime total sleep as the primary endpoint of the tasimelteon phase III study. Coincidence? Seems unlikely.

Changing the endpoints of an ongoing clinical trial -- especially without the FDA's blessing -- is a sign of trouble.

Speaking at an investor conference in July 2012, right after the tasimelteon study was changed, Vanda Chief Commercial Officer Robert Repella said, "We do not, at this point, have concurrence with the FDA on the primary and secondary endpoints for the study. We've been in active dialogue with the agency now for some time and we continue to move in the direction of clarification around how the endpoints will be characterized for the filing."

Even worse for Vanda: The "entrainment" co-primary endpoint finally selected for the tasimelteon phase III study was a urine-based laboratory measurement which couldn't be used on its own for an FDA drug approval. The second co-primary endpoint of the tasimelteon study relied on a "non-24 clinical response scale" created by Vanda and never validated or used by any other company or sleep expert conducting clinical trials.

In the phase III study, Vanda counted patients as responders if they passed three of four sleep-performance tests that made up the "non-24 clinical response scale." Why wasn't passing all four tests required for a response? Vanda has never explained.

Everything about the "non-24 clinical response scale" was arbitrary.

As an example, one of the four tests measured patient quality of life or global functioning known as CGI-C. A positive score was defined by Vanda as "less than or equal to 2 from the average of Day 112 and Day 183 compared to baseline."

The significance of measuring quality of life only from days 112 to 183 of the study has not been explained.

Vanda announced "positive" results from the phase III "SET" study of tasimelteon on Dec. 18, 2012. The study was designed originally to enroll 160 totally blind people (self reported, by the way) diagnosed with non-24. In August 2011, enrollment was reduced from 160 to 100 patients. In January 2012, enrollment was cut again from 100 patients to 84 patients.

Of the 84 patients enrolled into the study, 22 patients (26 percent) dropped out.

By Vanda's own admission, a majority of the patients enrolled in the tasimelteon study did not suffer from non-24, according to the "textbook definition" of the disease.

"Less than 5% of individuals matched the traditional textbook definition of N24HSWD with a clearly non-24 hour sleep period," Vanda states in a scientific poster presented in June 2012 which characterized patients screened for entry into the phase III study.

37. On this news, Vanda shares declined $2.41 per share or more than 22%, to close at $8.51 per share on June 19, 2013.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Vanda securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

24

39.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Vanda securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Vanda or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Vanda;

- whether the Individual Defendants caused Vanda to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Vanda securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

44.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Vanda securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Vanda securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

45.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

26

**(Against All Defendants For Violations of**
**Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

46.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

48.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Vanda securities; and (iii) cause Plaintiff and other members of the Class to purchase Vanda securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

49.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Vanda securities and options.  Such reports, filings, releases and

statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Vanda's finances and business prospects.

50.    By virtue of their positions at Vanda, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

51.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Vanda, the Individual Defendants had knowledge of the details of Vanda's internal affairs.

52.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Vanda.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Vanda's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Vanda securities was artificially inflated throughout the Class Period.  In

28

ignorance of the adverse facts concerning Vanda's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased Vanda securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

53.    During the Class Period, Vanda securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of Vanda securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of Vanda securities were substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Vanda securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

54.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

55.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the

Company had disseminated false financial statements to the investing public related to its prospects for FDA approval.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

56.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

57.    During the Class Period, the Individual Defendants participated in the operation and management of Vanda, and conducted and participated, directly and indirectly, in the conduct of Vanda's business affairs.  Because of their senior positions, they knew the adverse non-public information regarding Vanda's NDA submission to the FDA.

58.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Vanda's financial condition and results of operations, and to correct promptly any public statements issued by Vanda which had become materially false or misleading.

59.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Vanda disseminated in the marketplace during the Class Period concerning Vanda's financial prospects.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Vanda to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Vanda within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Vanda securities.

#2004733v.1

60.   Each of the Individual Defendants, therefore, acted as a controlling person of Vanda.  By reason of their senior management positions and/or being directors of Vanda, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Vanda to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Vanda and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

61.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Vanda.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

#2004733v.1

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: June 24, 2013

                                     /s/ Jaime W. Luse

John B. Isbister (D.C. Bar No. 277418)
jisbister@tydingslaw.com
Jaime W. Luse (D.C. Bar No. 501944)
jluse@tydingslaw.com
Tydings & Rosenberg LLP
100 East Pratt Street, 26th floor
Baltimore, MD  21202
(410) 752-9700 – telephone
(410) 727-5460 – facsimile

and

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**

Jeremy A. Lieberman
Lesley F. Portnoy
600 Park Avenue, 20th Floor
New York, New York 10016
Telephone: 212-661-1100
Facsimile:  212-661-8665

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: 312-377-1181
Facsimile:  312-377-1184

*Counsel for Plaintiff*

#2004733v.1